**DONNYBROOK BUILDING SUPPLY CO., INC., Appellant,**

v.

**ALASKA NATIONAL BANK OF THE NORTH, a National Banking Association, Appellee.**

**No. S–1385.**

Supreme Court of Alaska.

May 15, 1987.

Peter J. Aschenbrenner, Aschenbrenner & Brooks, Fairbanks, for appellant.

Winston S. Burbank and Constance A. Cates, Call, Barrett & Burbank, Fairbanks, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This case involves a dispute between a construction lender and a material supplier under Alaska's stop-payment notice statute, AS 34.35.062, as it read in 1985.[1]

Donnybrook Building Supply, Inc., (Donnybrook) provided $46,000 worth of building supplies on credit to a contractor for two houses financed by Alaska National Bank of the North (ANB). Donnybrook, asserting that it had not been paid by the recently-bankrupt contractor, sued ANB to recover the $46,000 under the stop-payment notice statute and other theories.

The trial court granted partial summary judgment on liability in favor of ANB. The court held that ANB could not be liable under the stop-payment notice statute because it had made no disbursals from the construction funds after receiving the stop-payment notices.[2] Without considering Donnybrook's other theories of recovery, the court entered final judgment against Donnybrook.[3]

Donnybrook appeals. It claims that the stop-payment statute guarantees its interest in undisbursed construction funds and that the statute is not its exclusive remedy.

We affirm. A stop-payment notice does not give a supplier an interest in undisbursed construction funds.[4] A construction lender becomes directly liable to a supplier only if it has disbursed construction funds after receipt of a stop-payment notice. Additionally, the statutory mechan-

---

1. AS 34.35.062 was extensively revised in 1986. Ch. 102, § 1, SLA 1986. All citations in the opinion will be to the statute as it read in 1985.

2. Contrary to Donnybrook's assertion, the court was not bound by a previous ruling in favor of Donnybrook under a "law of the case" theory. A trial court can correct its own mistakes before entry of judgment. *Lamer v. McKee Industries, Inc.*, 721 P.2d 611, 613 n. 2 (Alaska 1986); *Hayes v. Xerox Corp.*, 718 P.2d 929, 934 (Alaska 1986). *See also Stepanov v. Gavrilovich*, 594 P.2d 30, 36 (Alaska 1979).

3. The judgment required ANB to pay $1,230 to Donnybrook. ANB had confessed judgment for this amount based on Donnybrook's claim that ANB had guaranteed payment of Cain's NSF check for that sum.

4. A claimant under the stop-payment notice statute may be, *inter alia*, a contractor, subcontractor, or material supplier. AS 34.35.062(a)(2); AS 34.35.050. We will refer to claimants generally as suppliers.

ics' lien scheme, of which the stop-payment statute is a part, constitutes a complete remedy that preempts common law and equitable remedies.

## FACTS AND PROCEEDINGS

Donnybrook sold building supplies on open account to Eugene Cain and Violet Mullen, doing business as Executive Builders (Cain/Mullen), for houses they built in Fairbanks in 1981 and 1982. Cain/Mullen's first projects were financed by Interior City Branch, First National Bank (ICB); their last three projects were financed by ANB. Donnybrook established a separate charge account for each house project.

In mid-October 1982, Donnybrook was advised that ANB was the construction lender for the last three houses. At that time, several of Cain/Mullen's other accounts with Donnybrook were in arrears. ANB issued two checks for $25,000 each payable to Mullen, Cain and Donnybrook on October 27, intending that they be applied to the accounts for two of the ANB-financed houses. Instead, Donnybrook applied the money to Cain/Mullen's accounts with the oldest balances. These were for houses financed by ICB.

Donnybrook filed Notices of Right to Lien pursuant to AS 34.35.064 for the two house projects at issue here on October 29. In December, Cain left Fairbanks, leaving the two houses incomplete. The market value of the houses plus the remaining construction funds held by ANB totalled less than the construction debt Cain/Mullen owed on them to ANB.

Donnybrook filed stop-payment notices totalling $47,181.39 with ANB against the two projects pursuant to AS 34.35.062 on January 6, 1983. It recorded lien claims for $46,181.08 against the properties on January 20.[5] Donnybrook filed suit to enforce its stop-payment notices pursuant to AS 34.35.062(c) on February 7, 1983. On February 25, Cain/Mullen filed for bankruptcy.

ANB did not disburse funds from the construction accounts after receiving Donnybrook's stop-payment notices. ANB declared the Cain/Mullen notes in default and foreclosed on its deeds of trust in the properties. The value of the properties was less than the outstanding loan balance.

## DISCUSSION

The first issue raised by the trial court's decision is whether AS 34.35.062 gives a supplier a direct interest in construction funds on termination of the project when the lender does not disburse the funds but instead applies them against the builder's loan balance.[6] The second issue is whether the mechanics' lien laws create an exclusive remedy for unpaid suppliers. Our standard of review of issues of law is the substitution of judgment test. *Borkowski v. Snowden*, 665 P.2d 22, 25 (Alaska 1983).

Alaska Statute 34.35.062 was part of a complex statutory scheme designed to protect subcontractors and material suppliers who provide labor and materials on construction projects. AS 34.35.050–.120. Typically, a private construction project is financed by a construction lender who commits a fixed sum to the project. This loan is secured by a first mortgage in the development. The loan is paid out in installments as work progresses. Suppliers also extend credit to the developer. *See generally Reitz, Construction Lenders' Liability to Contractors, Subcontractors, and Materialmen*, 130 U.Pa.L.Rev. 416, 417–18 (1981). Before 1978, subcontractors and suppliers were able to protect themselves by taking a priority lien in the real property under construction. Former AS 34.35.060 (repealed by ch. 175, § 19, SLA 1978); *see Brand v. First Federal Sav. & Loan Ass'n. of Fairbanks*, 478 P.2d 829, 832 (Alaska 1970). In 1978, the legislature repealed this lien priority, and substituted the statutory "stop payment notice" procedure. Under this procedure, a supplier can re-

---

**5.** The discrepancy is attributed to finance charges.

**6.** Although Donnybrook did not assert as error the trial court's decision on this issue in its Statement of Points on Appeal as required by

Alaska R.App.P. 210(e), we choose to address it because the issue was raised before the trial court and was fully briefed by both parties. *See Mullen v. Christiansen*, 642 P.2d 1345, 1350 (Alaska 1982).

solve claims against a developer by "intercepting" construction loan disbursements made by the lender.[7]

We have not previously construed a stop-payment notice statute.

## A. A Stop-payment Claim Does Not Reach Undisbursed Construction Funds

Our starting point for interpreting a statute is the language of the statute construed in light of the purpose for its enactment. *Commercial Fisheries Entry Comm'n v. Apokedak*, 680 P.2d 486, 489–90 (Alaska 1984).

Alaska Statute 34.35.062[8] permits a supplier who has maintained his right to a mechanics' lien by recording necessary notices and whose bills to a developer are 20 days overdue to serve a stop-payment notice on the construction lender. AS 34.35.062(a)(2). Upon receipt of the stop-payment notice, the lender "shall withhold" from the contractor's subsequent draws the sum claimed by the supplier. AS 34.35.062(a)(4). The lender can only disburse the claimed amount upon court order or written agreement of the claimant and developer. AS 34.35.062(a)(5). If the lender does disburse funds in violation of a stop-

---

7. Stop-payment statutes have been passed in several states. Reitz, *supra* p. 6, 433 n. 54. Washington's stop-payment statute, Wash.Rev. Code Ann. § 60.04.210 (West Supp.1986); and California's stop-notice statute, Cal.Civ.Code § 3162 (West 1974), are most like Alaska's. Stop-notice statutes have also been the subject of considerable legal commentary. *See, e.g.,* Reitz, *supra* p. 6, 432; Gutierrez, California Civil Code Section 3264 and the Ghost of the Equitable Lien, 30 Hastings L.J. 493, 518 (1979); Comment, Mechanics' Liens: The "Stop Notice" Comes to Washington, 49 Wash.L.Rev. 685, 694 (1974); Ilyin, Stop Notice!—Construction Loan Officer's Nightmare, 16 Hastings L.J. 187 (1964).

8. In 1985, AS 34.35.062 read as follows:
   *Construction financing.* (a) A lender providing construction financing where there is not a payment bond of at least 50 per cent of the amount of construction financing shall observe the following procedures:
   (1) Draws against construction financing shall be made only after certification of job progress to the lender by the general contractor, if any, and the owner. The form of the certification may be prescribed by the lender.
   (2) A claimant described in AS 34.35.050 who has not received payment within 20 days after the date for payment required by the contract or employee benefit trust agreement or, if no date for payment is specified, then 30 days after the labor, materials, services, or equipment are first furnished, may within 20 days thereafter give a stop-payment notice of the sums due for which the claimant may claim a lien under AS 34.35.095.
   (3) The stop-payment notice shall be given to the lender and to the owner. The stop-payment notice shall state in substance
   (A) the name of the person ordering the labor, materials, services, or equipment;
   (B) a sufficient legal description of the real property being improved or developed;
   (C) a description of the labor, materials, services or equipment furnished, or obligation owed to an employee benefit trust;

(D) the name, business address and telephone number of the claimant; and
(E) the sum due and not yet paid under the claimant's contract which may include an amount not to exceed 50 per cent of the principal amount of the claim for interest, reasonable costs, and attorney fees.
(4) After receipt of a stop-payment notice under this section, the lender shall withhold from the next and subsequent draws sufficient money to pay the amount claimed in the stop-payment notice.
(5) Sums withheld under a stop-payment notice may not be disbursed by the lender except under the terms of a written agreement signed by the claimant, owner and general contractor or by order of a court of competent jurisdiction.
(b) If a lender fails to comply with the provisions of (a)(4) or (5) of this section, the lender shall be liable to the claimant for an amount equal to the sum disbursed in violation of those subsections or the sum ultimately determined to be due the claimant by a court of competent jurisdiction, whichever is less.
(c) Within 30 days after filing a stop-payment notice the claimant may file an action in a court of competent jurisdiction to obtain the sums claimed in the stop-payment notice. The complaint shall be accompanied by a bond in an amount equal to the amount claimed with sufficient sureties as approved by the court. The claimant shall give notice to the lender that the action has been filed and include a copy of the bond filed with the action. If a claimant fails to file an action under this subsection and to serve notice of the filing and a copy of the bond upon the lender within 30 days after filing the stop notice, or to execute a written agreement under (a)(5) of this section, the lender may disburse the money withheld under the claimant's stop-payment notice without incurring liability to the claimant.

payment notice, the lender becomes directly liable to the supplier for the lesser of the sum disbursed or the amount of the valid claim. AS 34:35.062(b). The stop-payment notice expires automatically after 30 days unless the supplier files a bonded suit to enforce his claim. AS 34.35.062(c).

The stop-payment notice thus puts direct financial pressure on the contractor to pay his suppliers. If he does not, the amount claimed will normally be withheld from his next draw. The lender can pay the claimant directly if the claimant and developer agree, or if a court orders it. The lender will be directly liable to the claimant if it disburses funds without withholding funds to pay the claim.

In this case, however, after ANB received the stop-payment notice, it apparently neither prevailed upon the developer to pay the claim[9] nor disbursed funds in violation of the statute. Instead, ANB ceased making disbursals and declared Cain/Mullen's loan in default. Cain/Mullen became insolvent. ANB foreclosed on the construction property but recovered less than the debt owed to it by Cain/Mullen. Now ANB apparently seeks to apply the remaining construction funds to the outstanding debt pursuant to its loan agreement with Cain/Mullen. Donnybrook contends that its stop-payment claim must be paid from the undisbursed construction funds.

ANB argues that it is not liable under AS 34.35.062 because the stop-notice remedies against the lender are explicitly limited to the lesser of the amount claimed or the amount "disbursed in violation of those subsections." AS 34.35.062(b). Because it did not disburse the funds remaining in the accounts, ANB argues, those funds are not subject to Donnybrook's claims and thus can be applied toward the deficiency remaining on Cain/Mullen's construction loan debt.

Donnybrook argues that a stop-payment notice requires the lender to ensure that a supplier's claim is settled before the lender releases construction funds for any use, including repayment of the construction loan. Donnybrook observes that the statute is remedial in purpose and argues that it should be construed liberally to achieve the remedies intended.

We agree that this statute is remedial and that its purpose is to protect subcontractors and material suppliers. We will construe a remedial statute liberally to fulfill its purposes. *See Moores v. Alaska Metal Buildings, Inc.*, 448 P.2d 581, 584 (Alaska 1968) (adopting liberal construction of the former mechanics' lien statute). However, the language of this statute compels the determination that a stop-payment claim does not take a priority interest in undisbursed construction funds.

Alaska Statute 34.35.062(a)(4) states: "After receipt of a stop-payment notice under this section, the lender *shall* withhold *from the next and subsequent draws* sufficient money to pay the amount claimed ..." (emphasis added). Subsection (b) provides for direct lender liability for the lesser of the valid claim amount as determined by a court or the amount disbursed. When no funds are disbursed, the lender incurs no liability.

The lender's duty to withhold funds does not attach to the entire construction fund, but only to "the next and subsequent draws." AS 34.35.062(a)(4). "Draws" are "periodic disbursements of construction financing by a lender." AS 34.35.120(6). The draw procedure is mandated by statute on unbonded projects. AS 34.35.062(a). The lender issues draws based on construction progress; if no further progress is made, as determined by the lender's certification, then no draws become payable to the contractor. In effect, the statute assigns to the claimant the developer's right to collect a draw due from the lender. Where no draw becomes due based on the lender's agreement with the developer and the statute, there is nothing to assign to the claimant.

---

9. ANB contends that Donnybrook's claims were previously paid but that Donnybrook misapplied the funds to other Cain/Mullen accounts.

Because we find that ANB has no liability to Donnybrook in any event, we need not resolve this claim.

The State of Washington has a similar stop-payment notice statute.[10] A comment evaluating this statute observed that the lender had three options upon receipt of the stop-payment notice: (1) to withhold the claimed sum from later draws; (2) to permit later draws and risk loss of its senior lienor status (the Washington statute provides this remedy where Alaska's provides for direct lender liability); or (3) to "avoid the effect of the stop notice altogether by making no further loan advances and foreclosing his mortgage. In this last situation, the [claimant's] only recourse is to his mechanics' lien which will have no enhanced priority by reason of the stop notice." Comment, *supra* note 7, 695–96. In *In re Aspen Homes, Inc.*, 54 B.R. 541, 545 (Bankr.E.D.Wash.1985), a bankruptcy court cited this comment with approval, and held that the Washington statute allowed a lender to foreclose the interest of a suppli-

er by declaring the developer's loan in default and using remaining construction funds to pay new suppliers to complete the project. *Id.*

The California stop-notice statute[11] has been interpreted to impose on the lender the duty to pay stop-notice claimants out of undisbursed construction funds. *A–1 Door and Materials Co. v. Fresno Guarantee Sav. & Loan Ass'n*, 61 Cal.2d 728, 40 Cal. Rptr. 85, 89, 394 P.2d 829, 833–34 (1964) (decided under earlier version of present statute). The *A–1 Door* court held that a construction lender, having fully committed a given sum to a developer for a project, holds undisbursed funds as an assignee (for security) of the developer. *Id.* 40 Cal. Rptr. at 89, 394 P.2d at 834. The statute expressly barred any assignment of the loan funds in derogation of a claimant's right. *Id.* Furthermore, the court held that the stop notice attaches to the entire

---

**10.** The Washington stop-payment notice statute reads in part:

Any lender providing interim or construction financing where there is not a payment bond of at least fifty percent of the amount of construction financing shall observe the following procedures:

(1) Draws against construction financing shall be made only after certification of job progress by the general contractor and the owner or his agent in such form as may be prescribed by the lender.

(2) Any potential lien claimant who has not received a payment within five days after the date required by his contract, employee benefit plan agreement, or purchase order may within twenty days thereafter file a notice as provided herein and to become due, for which a potential lien claimant may claim a lien under chapter 60.04 RCW.

. . . . .

(4) After the receipt of such notice, the lender shall withhold from the next and subsequent draws such percentage thereof as is equal to that percentage of completion as certified in subsection (1) of this section, which is attributable to the potential lien claimant as of the date of the certification of job progress for the draw in question less contracted retainage. The percentage of completion attributable to the lien claimant shall be calculated from said certification of job progress, and shall be reduced to reflect any sums paid to or withheld for the potential lien claimant. Alternatively, the lender may obtain from the general contractor or borrower a payment bond for the benefit of the potential lien claimant in such sum.

(5) Sums so withheld shall not be disbursed by the lender except by the written agreement of the potential lien claimant, owner and general contractor in such form as may be prescribed by the lender, or the order of a court of competent jurisdiction.

(6) In the event a lender fails to abide by the provisions of subsections (4) or (5) of this section, then the mortgage, deed of trust or other encumbrance securing the lender will be subordinated to the lien of the potential lien claimant to the extent of the interim or construction financing wrongfully disbursed, but in no event in an amount greater than the sums ultimately determined to be due the potential lien claimant by a court of competent jurisdiction, or more than the sum stated in the notice, whichever is less.

Wash.Rev.Code Ann. § 60.04.210 (West Supp. 1986).

**11.** The California stop-notice statute reads:

Upon receipt of a stop notice pursuant to Section 3159, the construction lender may, and upon receipt of a bonded stop notice the construction lender shall, withhold from the borrower or other person to whom it or the owner may be obligated to make payments or advancement out of the construction fund, sufficient money to answer such claim and any claim of lien that may be recorded therefor, unless a payment bond has been recorded pursuant to the provisions of Section 3235 at any time prior to the serving of the first stop notice or bonded stop notice.

Cal.Civ.Code § 3162 (West 1974).

fund, not just to funds subsequently disbursed. *Id.* 40 Cal.Rptr. at 90, 394 P.2d at 833. A stop-notice claimant is thus guaranteed payment even though the developer has disappeared or gone bankrupt.[12] Ilyin, *supra* note 7, 187.

Unlike the California statute, AS 34.35.-062 expressly applies only to funds disbursed after the lender receives the stop-payment notice. Furthermore, AS 34.35.-062 does not bar an assignment by the developer of his right to receive loan funds. Indeed, the draw procedure of AS 34.35.-062(a)(1) suggests that the legislature did not view the lender's interest in the loan funds as an assignee of the developer, but instead established that the developer's interest in the loan funds did not vest until the lender certified each draw.[13]

We do not see that the equities sharply favor either party. While a supplier may be less able to assess the credit-worthiness of a developer than a lending institution, and may implicitly rely on the loan in extending credit to the developer, the lender is also in the business of providing an essential "material" for construction and does not intend to insure the payment of other suppliers nor to bear the unavoidable risk of the project. Placing upon lenders the obligation to ensure that suppliers are paid may well have the effect of increasing interest rates and limiting loan availability, especially to smaller developers. *See* Gutierrez, *supra* note 7, 520–21. Particularly where the project is incomplete, courts have been reluctant to make lenders liable to suppliers under equitable theories. *E.g., JG Plumbing Service Inc. v. Coastal Mortgage Co.,* 329 So.2d 393, 395 (Fla.App. 1976); *see generally* Reitz, *supra* p.6, 442–50.

We conclude that the legislature intended to empower lenders to cut off suppliers' claims if the lenders are willing to risk the loss of the developer's efforts before the project is complete. Therefore, we affirm the trial court's decision that Donnybrook has no remedy under AS 34.35.062.

## B. Alternative Remedies

■ Donnybrook asserts that, even if its stop-payment claim is unsuccessful, ANB is nonetheless liable for Cain/Mullen's debt under several other theories.[14] First, Donnybrook seeks an equitable lien against the construction funds. Second, Donnybrook claims that the draw procedure of AS 34.-35.062(a)(1) imposes a duty of care upon a lender toward suppliers, for the breach of which a supplier may recover damages.

Alaska's mechanics' lien law, AS 34.35.-050–.120, establishes a complex and detailed scheme for the protection of suppliers on construction projects. The legislature clearly sought to balance the conflicting interests of developers, lenders and suppliers under this statutory umbrella. The statutes provide two separate remedies for suppliers: the stop-payment remedy of AS 34.35.062, and the mechanics' lien under AS 34.35.050. All suppliers have an equal right to the stop-payment notice remedy, but an "individual actually performing labor" (or his trust fund) is entitled to a priority lien. AS 34.35.060(c). While no party to this action asserts a claim under AS 34.35.060(c), we believe that that ex-

---

12. If several stop-notice claims total more than the total remaining in the loan fund, the claimants share the loan fund *pro-rata.* Ilyin, *supra* note 7, 191.

13. Even if we assumed that the developer took a vested right to receive the loan funds when he executed the loan documents, and subsequently assigned this right first to the lender and then (by statute) to the supplier, we would find that the lender's priority in time gave it priority in right. *Cf. McKnight v. Rice, Hoppner, Brown & Brunner,* 678 P.2d 1330, 1334 (Alaska 1984) (first assignee in time is first in right); Restatement (Second) of Contracts § 342 (1981).

14. Suppliers in other states have claimed access to the loan fund under a variety of theories, including the equitable lien, constructive trust, negligent entrustment, negligent disbursement of loan funds and concealment of loan funds. Gutierrez, *supra* note 7, 497. The supplier may also make contract claims directly against the lender on the ground that the supplier was a third party beneficiary of the loan agreement, or that the lender guaranteed the developer's debt, or independently promised to pay it. Promissory estoppel might support such a claim. Reitz, *supra* p. 6, 422, 429–30. Finally, a supplier could claim tort damages for misrepresentation by a lender. *Id.* at 432.

press priority is an indication of legislative intent to provide a complete and prioritized system of remedies. To impose judicially additional remedies on behalf of suppliers here would disturb this balance.

Furthermore, the legislature expressly retained the right of a lienor "under a contract" to utilize his contract remedies regardless of his lien. AS 34.35.045. Because only this exception to the exclusivity of the mechanics' lien law remedies is expressed, the statutory maxim *expressio unius est exclusio alterius* suggests that other remedies are excluded. *Burrell v. Burrell*, 696 P.2d 157, 165 (Alaska 1984). We conclude that the mechanics' lien law preempts the remedies sought by Donnybrook. *Cf. Aleut Corp. v. Arctic Slope Regional Corp.*, 424 F.Supp. 397, 399–400 (D. Alaska 1976) (Alaska's legislative scheme of attachment-type remedies preempts common law sequestration).

## C. Conclusion

We conclude that the plain language of AS 34.35.062 precludes Donnybrook's stop-payment notice action because ANB did not disburse construction funds following receipt of the notice. Furthermore, the mechanics' lien law is an exclusive remedy which preempts Donnybrook's equitable lien and statutory duty theories of recovery. Therefore, we AFFIRM the trial court's judgment.